**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------X
ALEXANDRIA FITZGERALD,                                          :
                                                               :     Civil Action No.:
                              Plaintiff,                        :
                                                               :
              -against-                                         :
                                                               :     **COMPLAINT**
THE WE COMPANY d/b/a WEWORK; DAVID                              :
STILES; and DANNY DUONG, in their                              :
individual and professional capacities,                        :     **Jury Trial Demanded**
                                                               :
                              Defendants.                       :
-----------------------------------------------------------------X

      Plaintiff Alexandria Fitzgerald ("Ms. Fitzgerald" or "Plaintiff"), by and through her

attorneys, Wigdor LLP, as and for her complaint against We Company d/b/a WeWork

("WeWork" or the "Company"),  hereby alleges as follows:

<u>**PRELIMINARY STATEMENT**</u>

      1.     The term "recessionary discrimination" describes when employers use economic

layoffs to target employees whom they deem "problematic" for unlawful discriminatory or

retaliatory reasons.  The We Company d/b/a WeWork ("WeWork" or the "Company") did

exactly that when it made Plaintiff part of a reduction in force ("RIF") it initiated during the

COVID-19 pandemic.  Plaintiff had made complaints about sexual harassment, as well as

gender-based discrimination and retaliation, before the global pandemic arose.  Moreover,

shortly before her unlawful termination, Plaintiff made the Company aware of her disability and

need for intermittent medical leave.  Yet WeWork did nothing to help her and everything to

sweep Ms. Fitzgerald's complaints and concerns under the rug.  Most troublingly, WeWork

failed to adequately discipline Ms. Fitzgerald's harasser, David Stiles ("Defendant" or "Stiles"),

even after being provided with direct proof of his unlawful and inappropriate conduct.  Instead,

WeWork choose to silence Plaintiff by getting rid of her under the pre-text of a RIF it undertook during the COVID-19 pandemic while maintaining Defendant Stiles in its employ.

## NATURE OF ACTION

2.     The unlawful discrimination and retaliation described herein was committed in violation of the New York State Human Rights Law, N.Y. Executive Law §§ 290 *et seq*. ("NYSHRL"), the New York City Human Rights Law, N.Y.C. Administrative Code §§ 8-107 *et seq*. (the "NYCHRL"), and the Family and Medical Leave Act, 29 U.S.C. §§ 2601 *et seq*. ("FMLA").

## ADMINISTRATIVE PREREQUISITES

3.     Plaintiff filed a complaint with the Equal Employment Opportunity Commission ("EEOC") prior to the commencement of this action, and she will file an Amended Complaint alleging violations of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e *et seq.* ("Title VII") and the Americans with Disabilities Act, 42 U.S.C. §§12101 *et. seq.* ("ADA") following the EEOC's issuance of a Notice of Right to Sue.

4.     Following commencement of this action, a copy of this Complaint will be served both on the New York City Commission on Human Rights and the Office of the Corporation Counsel of the City of New York, thereby satisfying the notice requirements of the New York City Administrative Code.

5.     Thus, any and all other prerequisites to the filing of this suit have been met.

## JURISDICTION AND VENUE

6.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331, as this action involves federal questions regarding the deprivation of Plaintiff's rights under the FMLA.

7.     The Court has supplemental jurisdiction over Plaintiff's related claims arising under State and local law pursuant to 28 U.S.C. § 1367(a).

8.     This Court has diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1) because there is diversity of residence of the named parties and the amount in controversy exceeds $75,000.

9.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to this action, including the unlawful employment practices alleged herein, occurred in this district.

## PARTIES

10.     Plaintiff, Alexandria Fitzgerald, is the former employee of WeWork and is a resident of the State of New Jersey.  Throughout her employment at WeWork, Ms. Fitzgerald's primary place of business was in New York, New York.  At all relevant times, Plaintiff met the definition of "employee" and/or "eligible employee" under all applicable statutes.

11.     Defendant WeWork is a New York based company.  Its headquarters is at 115 West 18th Street, New York, New York 10011.  At all relevant times, Defendant met the definition of an "employer" and/or a "covered employer" under all relevant statutes.

12.     Defendant David Stiles is a Project Executive at WeWork.  Upon information and belief, Stiles is a resident of the State of New York.

13.     Defendant Danny Duong ("Duong") is a Project Executive Director at WeWork. Upon information and belief, Duong is a resident of the State of New York.

14.     Defendants WeWork, Stiles, and Duong are occasionally referred to herein collectively as "Defendants."

## FACTUAL ALLEGATIONS

I.    **Background**

15.    Ms. Fitzgerald received her Bachelor of Arts in Communications, Public Relations and Journalism from Monmouth University in 2014.

16.    After graduating, Ms. Fitzgerald went to work at NBC Universal ("NBC") as an Operations, Strategy and Business Lead.  While at NBC, Ms. Fitzgerald scaled business operations to support project execution and growth across several states, including New York, Florida, California, and New Jersey.

17.    Ms. Fitzgerald also delivered innovative team building events and professional trainings for more than 350 attendees and acted as Project Manager for numerous high-profile production events, including the Rio Olympics, election coverage, and the Tonight Show with Jimmy Fallon Road Show.

18.    In Fall 2018, while still working for NBC, Ms. Fitzgerald was in charge of procuring a WeWork space for a special project.

19.    One of Ms. Fitzgerald's former NBC colleagues had gone to work for WeWork as a Workplace Strategy Manager.

20.    This former colleague told Ms. Fitzgerald that there were opportunities that would fit her experience and encouraged her to apply for a job.

21.    Ms. Fitzgerald was connected with a recruiter, who insisted that WeWork had great perks, including matching 401K contributions, an incredible healthcare plan, a large amount of paid time off, and frequent international travel.

22.     The job posting was for the position of Program Manager.  Ms. Fitzgerald interviewed for, and was offered, the position by WeWork, which she eagerly accepted because of the incredible opportunities it presented to her.

23.     Unfortunately, the pervasively competitive, macho culture that was especially disrespectful towards female employees, as well as the disregard for harassment and disability issues in the workplace, became apparent to Ms. Fitzgerald very quickly after she became employed by WeWork.

24.     On March 25, 2019, on Ms. Fitzgerald's first day of employment at the Company, she met with the Vice President and Global Head of Enterprise Services Julian Clayton.

25.     Mr. Clayton made the following point-blank statement to Ms. Fitzgerald:

> I don't know you, I don't know why they hired you for my team, and it may work or it may not.  WeWork is a culture of rapid change and high stress and it doesn't work for everybody, most people here won't make it a year, you probably won't either.  I won't blame you if 6-8 months you can't do it anymore.

**II.     Stiles's Penchant for Violence and Weaponry**

26.     After Ms. Fitzgerald started at WeWork, her first big client was Sprint, and she was assigned to assist in a complete overhaul of the Sprint corporate park in Overland Park, Kansas.

27.     Stiles, as a Senior Lead Program Manager with seniority at the Company, instantly assumed a supervisory and mentoring role towards Ms. Fitzgerald.  Thus, during her first few weeks at WeWork, Ms. Fitzgerald was assigned to shadow Stiles in order to learn the ins and outs of the Company.

28.     Unfortunately, beginning early in Ms. Fitzgerald's tenure at WeWork, Stiles began to make comments that rendered her increasingly uncomfortable.

29.     Stiles regularly insinuated that he had relatives and friends in the Mafia.

30.     Additionally, Stiles often talked about his passion for weaponry.

31.     Stiles made it known that he owned scores of knives, machetes, and crossbows.

32.     It was well known among his colleagues that Stiles always carried knives on him, even at work.

33.     In fact, Stiles regularly displayed his knives at work to impress his coworkers.

34.     In late Spring or early Summer 2019, Stiles brought a crossbow into work and placed it on the floor next to his desk.

35.     Ms. Fitzgerald was shocked and asked Stiles what it was.

36.      Stiles nonchalantly responded to Ms. Fitzgerald that he was "going to practice shooting after work."

37.     In addition, Stiles often bragged about the fact that he had worked as a bouncer at a nightclub.

38.     During the COVID-19 work-from-home arrangement, WeWork has been hosting team meetings and happy hours via Zoom.

39.     During these meetings, Stiles would join the calls with several weapons displayed behind him.

40.     On these calls, Stiles would often show people his weapons, including his crossbows, knives, and a machete.  Many coworkers expressed to Ms. Fitzgerald that they found this odd to say the least.

41.     In fact, one WeWork employee, Morgen Schroeder, a Project Executive, told Ms. Fitzgerald that she was going to be making a list of all the inappropriate things that Stiles did or said.

**III.**   **Ms. Fitzgerald is Sexually Harassed by Stiles While on a Work Trip**

42.      On May 10, 2019, Ms. Fitzgerald and Stiles were summoned to fly to Kansas City in order to address an urgent issue with the Sprint account; presumably, Stiles was assigned to accompany Ms. Fitzgerald in a supervisory capacity as he had no operational role on the Sprint project in Kansas City.

43.      WeWork management asked Stiles to attend the trip with Ms. Fitzgerald to provide support because she was still relatively new to the job.

44.      When Ms. Fitzgerald and Stiles arrived at their hotel, the receptionists simultaneously asked both of them if they would like rooms that were adjoining or proximate.

45.      While Ms. Fitzgerald stated that she preferred they be on different floors, Stiles quickly responded that he "would like" for them to have rooms that were adjoining or proximate.

46.      The receptionists ignored Ms. Fitzgerald's request and put Stiles's room directly across from Ms. Fitzgerald's room.

47.      That night, Ms. Fitzgerald and Stiles met in the hotel lobby in order to dine together as previously planned.

48.      During dinner, Stiles began talking about how his wife was traditionally the breadwinner of the family and that he was concerned about their financial state because she was pregnant.

49.      Stiles then stated: "[my] wife is really petite like you and petite girls have always loved me.  You and her would get along great."

41.      In an effort to steer the conversation away from personal matters, Ms. Fitzgerald asked Stiles for advice about how to work more effectively with Belen Dox, a coworker who had not been very friendly or collegial toward her.

42.     Stiles responded: "that's easy, she has a crush on me, she will do anything I want."

50.     Ms. Fitzgerald was taken aback by this comment.

51.     Later in the conversation, Stiles commented that Samantha Urioste, Enterprise Services Operations Manager, who he thought was extremely effective, "also has a crush on me."

52.     At this point, Ms. Fitzgerald realized that Stiles seemed to believe that most women in the workplace were interested in him and made a mental note not to engage in any activity that might lead him to believe that she fell into that category.

53.     Later in the dinner, Stiles asked Ms. Fitzgerald if she had a boyfriend.

54.     Ms. Fitzgerald, now concerned about Stiles's intentions, prevaricated that she had a "long-distance boyfriend," although that relationship had previously ended.

55.     Stiles then took it upon himself to give Ms. Fitzgerald unsolicited relationship advice, though she explicitly told him that she did not "need any."

56.     Stiles said to Ms. Fitzgerald, "before you settle down you should **bang a few out**."

57.     Ms. Fitzgerald was appalled, and said "excuse me?"

58.     Stiles doubled-down, stating, "go out and **have a bunch of one-night stands** before you settle down."

59.     Ms. Fitzgerald stood her ground, telling Stiles "no I don't need that advice."

60.     Unfazed, Stiles escalated his inappropriate conduct by initiating physical contact later during the dinner; specifically, Ms. Fitzgerald had barbeque sauce on her face, and instead of telling her that, Stiles took his napkin and wiped the barbeque sauce from Ms. Fitzgerald's face while smiling.

61.     Ms. Fitzgerald became visibly upset that he had touched her without her consent and told Stiles, "don't ever do that again, next time just let me know."

62.     Once dinner ended, Stiles and Ms. Fitzgerald shared a car back to the hotel.

63.     While Stiles went into the hotel, Ms. Fitzgerald decided she was going to take a walk in the downtown Kansas City area and perhaps get a drink to calm her nerves.

64.     Ms. Fitzgerald then sat outside of a bar with two women she had met, one of whom had a dog.

65.     Shortly thereafter, Ms. Fitzgerald responded to a text inquiry from Stiles as to her whereabouts by humorously sending him a picture of the dog she was admiring.

66.     Attempting to give Stiles the benefit of the doubt, Ms. Fitzgerald continued the conversation and, at some point, texted Stiles that "[s]ome drunk guy is posted up next to me touching the dogs.  This just got Kansas weird."

67.     To Ms. Fitzgerald's dismay, Stiles responded in a sexualized manner by observing that the "drunk guy" was ***"[t]ryn to get dat hooray.  Bootay\*."***  In a similar vein, later that night, without provocation, Stiles texted Ms. Fitzgerald "***Lol want to cuddle*** 😊."

68.     Extremely uncomfortable, Ms. Fitzgerald ignored the text and changed the subject.

69.     However, Stiles was unremitting, later texting Ms. Fitzgerald, "***I still did not get an answer on that cuddling***" followed by a tongue emoji, which clearly insinuated sexual conduct.

70.     Ms. Fitzgerald was horrified and called her best friend in a panic.  Ms. Fitzgerald then walked around the city for a while because she was afraid to go back to the hotel since her room was directly across from Stiles's room.

71.     Exhausted and afraid to return to the hotel room, Ms. Fitzgerald went to the ambassador lounge in the hotel to hide because she knew that Stiles did not have access.

72.     While there, Ms. Fitzgerald called her mom and told her what had happened.

73.     Ms. Fitzgerald finally summoned up the courage to quietly sneak into her hotel room, trying desperately not to make a sound.

74.     Eventually, after another text from Stiles, Ms. Fitzgerald responded: "Phone died while I was out. No cuddling for me, Have a good night."

75.     The next morning, May 11, 2019, Ms. Fitzgerald and  Stiles had plans to go to breakfast together.

76.     Ms. Fitzgerald, distraught over Stiles's actions the prior night, tried to get out of going to breakfast by saying that she was not feeling well.

77.      Stiles was relentless, however, repeatedly requesting for Ms. Fitzgerald to meet with him for breakfast.

78.     Eventually, Ms. Fitzgerald decided to go to breakfast with Stiles because she thought he might apologize for his inappropriate actions.

79.      Stiles did not apologize at breakfast.  During the breakfast, Ms. Fitzgerald became so anxious that she hid in the bathroom for ten minutes thinking that she may vomit.

80.     After breakfast,  Stiles asked Ms. Fitzgerald to go to a store with him to pick out a present for his son.

81.     Cornered, Ms. Fitzgerald yielded to this request, and after they were finished, Stiles asked Ms. Fitzgerald if he could put his belongings in her room because she had late checkout privileges based on her hotel guest status.

82.     Ms. Fitzgerald tried to deny Stiles's request, making the excuse that she was going to catch an earlier flight, in order to prevent him from coming into her hotel room.

83.     Undaunted, Stiles continued to push Ms. Fitzgerald, stating that he had checked the flights and that there were no earlier flights.

84.     Ms. Fitzgerald tried to stave off Stiles's request, but eventually she gave in.

85.     Thereafter, although they had plans to tour the city together that day, Ms. Fitzgerald made multiple excuses in order to avoid spending time alone with Stiles.

86.     Nevertheless, Stiles texted Ms. Fitzgerald repeatedly throughout the day that he thought it was weird that she did not want to go through with their plans from the previous day to meet up and do some sightseeing.

87.     Further, Stiles insisted that he share a car to the airport with Ms. Fitzgerald.

88.     In another attempt to avoid Stiles, Ms. Fitzgerald feigned that her flight was delayed.

89.     Stiles repeatedly badgered Ms. Fitzgerald to share the car with him to the airport.

90.     When Ms. Fitzgerald believed that Stiles had left the hotel, she returned.

91.     However, Stiles was still outside waiting for the car that would take him to the airport.

92.     Stiles stated that he could tell the car to wait and that Ms. Fitzgerald could grab her belongings and join him.

93.     Ms. Fitzgerald once again demurred that her flight was delayed and that she was not headed to the airport.

94.     Because Stiles was Ms. Fitzgerald's *de facto* supervisor on the trip to Kansas City and had assumed a supervisory mentorship role towards her, the conduct described above implicates and constitutes *quid pro quo* harassment.

IV.     **Stiles's Continued Sexually Harassing Conduct**

95.     In late Spring 2019, Krissy Spasevski, a Project Executive approached Ms. Fitzgerald and stated, "you missed it, [Stiles] sexually harassed me, he touched my breasts."

96.     To Ms. Fitzgerald's knowledge, although multiple WeWork employees witnessed this incident, nothing was ever done by HR.

97.     On August 30, 2019, Ms. Fitzgerald needed to ask for Stiles's assistance with a project because many of her other coworkers had taken time off for Labor Day weekend.

98.      That night, Ms. Fitzgerald went to dinner with a client.

99.     While at dinner, the client asked Ms. Fitzgerald what "the deal" was with Stiles, because she had thought he was married but "he hit on me."

100.    Ms. Fitzgerald apologized to the client profusely and asked the client if she wanted Ms. Fitzgerald to report Stiles.

101.    The client asked Ms. Fitzgerald not to do so.

102.    Upon information and belief, based on her reaction, Stiles suspected that the client would confide in Ms. Fitzgerald about his inappropriate conduct given that Ms. Fitzgerald ran that project.

103.    Throughout Plaintiff's employment with the Company, Stiles would often make inappropriate sexual jokes during staff meetings.

104.     Stiles's colleagues would constantly need to tell him that a joke had crossed the line.

105.    By way of example only, as recently as April 2020, on a work Zoom call, Stiles joked that Ms. Spasevski should be a stripper or a pole dancer.

106.    On multiple occasions, when Stiles came up in conversation, people would refer to Stiles as "a creep" or tell Ms. Fitzgerald a story about his sexually inappropriate conduct.

107.    Based on the foregoing, WeWork never took effective and prompt remedial action to address Stiles's sexual harassment of Ms. Fitzgerald.

## V.    Ms. Fitzgerald Reports Stiles's Conduct and Faces Repeated Retaliation

108.    On May 13, 2019, Plaintiff's first day back in the office after returning from Kansas City, Ms. Fitzgerald recounted everything that had happened that weekend to her supervisor, Nicole Rodriguez, a Senior Program Manager.

109.    Ms. Rodriguez told Ms. Fitzgerald that she felt terrible for having put Ms. Fitzgerald in harm's way and encouraged her to register her concerns with Human Resources ("HR").

110.    Ms. Fitzgerald told Ms. Rodriguez that she was not comfortable going to HR yet and that she wanted to take time to figure out what to do.

111.    Ms. Rodriguez told Ms. Fitzgerald that, because she had never dealt with a situation of workplace sexual harassment, she would have to ask her supervisor, Akash Agarwal, a Senior Director, what to do.

112.    Nevertheless, Ms. Rodriguez assured Ms. Fitzgerald that she was going to "respect her privacy" and that Mr. Agarwal "needs to know and we will figure this out together."

113.    Ms. Fitzgerald emphasized that Stiles's prior references to violence and ties to the Mafia made her "uncomfortable about coming forward" and that she was "very intimidated by

him" because if he "lost his job leaving his family with no income and thought it was [her] fault, he might come and kill [her]."

114.    That same day, Stiles kept trying to find time for him to meet alone with Ms. Fitzgerald to prepare a report for higher ups about their trip to Kansas City.

115.    Stiles repeatedly sought out Ms. Fitzgerald, who tried to avoid him by saying she had to compile her notes and had other projects she needed to complete.

116.    Later that day, Stiles came into the pantry where Ms. Fitzgerald was and struck her hip with his hip, stating "when are we going to do this?"

117.    Shocked by this unwelcome "hip-check," Ms. Fitzgerald told Stiles to get away from her and ran into the bathroom where she cried for a significant period of time.

118.    In order to remain separated from Stiles, Ms. Fitzgerald recommended that they work on the report via Google Documents, so they did not need to work on it in person.

119.    When Ms. Fitzgerald arrived at work the next day, she hid in a quiet space to prepare for a meeting with Ms. Rodriguez, Mr. Agarwal, and Stiles.

120.    Approximately five to ten minutes prior to that meeting, Ms. Fitzgerald received an email from Maria Cox, HR Director, with the title "Complaint Acknowledgement"; the preview lines stated, "Dear Alexandria, I wanted to let you know that your concerns regarding David, were sent over to me."

121.    Upon seeing this missive, Ms. Fitzgerald became upset because she had not agreed to make a report to HR, was not told that HR had been informed, and was just minutes from sharing her screen in a meeting with Stiles, where he might have seen the complaint.

122.    Subsequently, Ms. Fitzgerald met privately with Ms. Rodriguez.

123.     Ms. Fitzgerald told Ms. Rodriguez about the email she had received from Ms. Cox and asked her what she should do about it.

124.     Ms. Rodriguez apologized to Ms. Fitzgerald for breaking her trust and for not telling Ms. Fitzgerald that she had told HR about her complaints but explained that she believed that she only had seventy-two hours to notify HR, or Ms. Rodriguez could have been suspended or fired.

125.     Because Ms. Cox had asked Ms. Fitzgerald to have a call the following day, Ms. Fitzgerald requested to work from home so that she could have privacy during their discussion.

126.     Ms. Fitzgerald also reported to Ms. Rodriguez that Stiles was making Ms. Fitzgerald "uncomfortable" and that he was "not getting the hints that I am uncomfortable."

127.     After Ms. Fitzgerald spoke to Ms. Rodriguez, she sent an email response to Ms. Cox.  Ms. Fitzgerald stated that she would be more than willing to set up a time to talk to her and participate in any investigation.

128.     Ms. Fitzgerald also informed Ms. Cox that the subject and first few lines of her email were incredibly revealing and that she could have been in a situation where her supervisors and the individual she complained about would have seen it, which would have been alarming and embarrassing to her.

129.     Ms. Cox apologized, but only stated that she was sorry that Ms. Fitzgerald's colleagues could have seen the email and that it "would have sucked," but ultimately, she brushed off Ms. Fitzgerald's concerns.

130.     The next day, Ms. Cox told Ms. Fitzgerald that: (i) she would need to speak to the Internal Investigations Department; (ii) they would need Ms. Fitzgerald to tell them the story

again; (iii) Ms. Fitzgerald would need to provide them with the text messages; and (iv) the investigation of her claims would "take some time."

131.    Ms. Cox also told Ms. Fitzgerald that she should continue to work from home until the investigation was complete or until she "felt comfortable to return."

132.    Ms. Fitzgerald felt it was strange that she was the one being asked to stay home instead of Stiles but ultimately agreed because she did not know how many other private conversations she would need to have in pursuit of the investigation, and there was not a lot of opportunity for privacy at WeWork.

133.    During Ms. Fitzgerald's conversations with Ms. Cox, she repeatedly requested the opportunity to be transferred to another team.

134.    There are multiple positions comparable to Ms. Fitzgerald's in various New York offices of WeWork.

135.    Ms. Cox told Ms. Fitzgerald that if she "felt super uncomfortable then we could look into it at a later time."  Unfortunately, Ms. Fitzgerald never received any follow up from Ms. Cox about a transfer.

136.    On May 17, 2019, Ms. Fitzgerald was contacted on Slack by Alissa Horn, Senior Director in Employee Relations and Global People Investigations.

137.    Later that day, Ms. Fitzgerald spoke to Ms. Horn and recounted the details of what had occurred in Kansas City with Stiles.

138.    Ms. Horn asked Ms. Fitzgerald for a copy of the texts and informed her that the next step would be for Ms. Horn to speak with Stiles.

139.     Approximately one week later, Ms. Horn told Ms. Fitzgerald that she had spoken to Stiles and that "he was shocked, he had no idea he had made you uncomfortable, he was extremely apologetic and he wants to apologize to you."

140.     Ms. Horn also acknowledged that Stiles's actions were "unprofessional, inappropriate and not how they expected WeWork employees to behave."

141.     Ms. Horn tried to assure Ms. Fitzgerald that she has been "doing this for a long time" and that Stiles had "showed true shock," was "so sorry," and could "not believe [Ms. Fitzgerald had taken] it in that manner."

142.     Ultimately, Ms. Horn presented Ms. Fitzgerald with two stark and unsatisfactory choices: either she could meet with Stiles in order for him to apologize or she could return to work as if nothing had happened.

143.     Ms. Horn refused to tell Ms. Fitzgerald if Stiles had received any disciplinary actions in order to "protect his privacy."

144.     Ms. Fitzgerald told Ms. Horn that she was not comfortable with the options she was given, that she did not want to have a conversation with Stiles, and that she felt like she should be moved to another team, or Stiles should be suspended.

145.     Ms. Horn refused to take Ms. Fitzgerald's desires into account and, instead, stated to Ms. Fitzgerald that she would not be supervised by Stiles nor would she have to work on projects with him; however, she would remain on the same team with him.

146.     It was clear to Ms. Fitzgerald that WeWork had no plans to take any significant corrective actions against Stiles.

147.     Utterly dismayed, Ms. Fitzgerald asked, again, what her options were with respect to switching teams in order to get away from Stiles.

148.     In response, Ms. Horn dismissed Ms. Fitzgerald's request and flippantly stated that she would "get to that."

149.     In late Spring 2019, Ms. Fitzgerald's team received a mandate that they would need to work in a specified area together.

150.     As a result, Ms. Fitzgerald wrote to Ms. Rodriguez and Mr. Agarwal and stated that she found it uncomfortable to work in close proximity to Stiles due to the prior incident of sexual harassment she had experienced involving him and asked that she be permitted to work in an area separate from him.

151.     Mr. Agarwal responded, "I don't want you to" and, as a compromise, Ms. Fitzgerald asked if she could work in the study.

152.     Mr. Agarwal responded that she could only work in the study "sometimes."

153.     During this timeframe, Ms. Fitzgerald followed up with Ms. Cox about her request for a transfer.

154.     Ms. Cox responded only that Ms. Fitzgerald could not be moved, that she needed to try to work with Stiles, and that he was willing to apologize to her.

155.     Ms. Cox further instructed Ms. Fitzgerald that if she ever felt uncomfortable that she should return to HR.

156.     Following her complaints of sexual harassment, Ms. Fitzgerald found it increasingly difficult to work with Mr. Agarwal, who was extremely critical of her and seemed hyper-focused on internal Company politics.

157.     Mr. Agarwal repeatedly lectured Ms. Fitzgerald about how she needed to write emails in order to cover the team and make sure they were "protected against other teams."

158.     Specifically, Mr. Agarwal was convinced they needed to protect themselves "in case another team wants to get us in trouble."

159.     Additionally, Mr. Agarwal was often dismissive and unreasonably demanding of Ms. Fitzgerald without any regard for her work-life balance.

160.     In June 2019, Ms. Fitzgerald had a one-on-one meeting with Mr. Clayton.

161.     At the beginning of the meeting, Ms. Fitzgerald thanked Mr. Clayton for addressing the situation with Stiles.

162.     At that moment, it became clear that Mr. Clayton did not want to discuss the situation, and brushed Ms. Fitzgerald off.

163.     During this meeting, Ms. Fitzgerald told Mr. Clayton that she wanted to be transferred from Mr. Agarwal's team because she had difficulty working with Mr. Agarwal and she preferred not to be on the same team as Stiles given what had transpired between them.

164.     Ms. Fitzgerald told Mr. Clayton that she preferred to work for Chaz Crosse, Senior Director, because Mr. Crosse was often much more helpful when she had questions regarding her projects.

165.     Prior to this conversation, Mr. Crosse had alluded to Ms. Fitzgerald that he believed she could be transferred but that she needed to make the request directly.

166.     Mr. Clayton confirmed to Ms. Fitzgerald that he had already received complaints about Mr. Agarwal from other employees but that, if he was going to move her, he would need a "good reason."  Nevertheless, Mr. Clayton said that he would "look into this."

167.     Instead of respecting her privacy and protecting her working relationship, Mr. Clayton kept Ms. Fitzgerald under Mr. Agarwal and inexplicably told Mr. Agarwal that Ms. Fitzgerald did not like working for him.

168.    In early Summer 2019, Ms. Fitzgerald was working on a project with Daniel Lowe, another WeWork employee, for AirBnb.

169.    It was well known throughout WeWork that, while Mr. Lowe was incredibly abusive and demeaning, he was untouchable because his father was an early investor at WeWork.

170.    Ms. Fitzgerald complained to Mr. Agarwal that Mr. Lowe was being rude to clients, and that he was condescending, demeaning and disrespectful to her, and would raise his voice at her in front of clients and colleagues.

171.    Ms. Fitzgerald even provided Mr. Agarwal with a number of messages from Mr. Lowe wherein he called a client chubby and made multiple demeaning remarks.

172.    This all came to a head when Ms. Fitzgerald realized that Mr. Lowe was trying to do the project "off the books" by not hiring an architect to receive proper plans and obtain the required permits for the work that needed to be done.  When Ms. Fitzgerald expressed concern to Mr. Lowe, he responded that this was the "typical WeWork way of doing things."

173.    While working with Mr. Lowe, Ms. Fitzgerald was made aware by multiple colleagues that Mr. Lowe's father was one of the first investors at WeWork and that he was "protected."

174.    The client, AirBnB, had also made multiple complaints about Mr. Lowe to Ms. Fitzgerald, which she conveyed to Mr. Agarwal as her supervisor.  Mr. Agarwal responded to Ms. Fitzgerald that "[w]e all know [Mr. Lowe] is a terrible to work with and has a bad temper– tread lightly."

175.    As a result of her complaints about, inter alia, Mr. Lowe's demeaning attitude towards women, Ms. Fitzgerald was ultimately taken off the project.

176.     This constituted further retaliation by the Company against Ms. Fitzgerald because she engaged in protected activity.

177.     Also in Summer 2019, a couple of months after the incident with him in Kansas City, Ms. Fitzgerald received an instant message from Stiles asking to speak to her in person.

178.     This made Ms. Fitzgerald immensely anxious, but she, nonetheless, agreed to meet with Stiles in a public area on the sixth floor.

179.     When they met, Stiles stated that he had been given a lot of new responsibility because Mr. Crosse had been promoted and Stiles had to assign the projects out to people, stating that he was going to assign Ms. Fitzgerald three projects to work on with him in Minneapolis.

180.     After this meeting, Ms. Fitzgerald contacted Ms. Cox to ask why she had been assigned to work on projects for Stiles when she had been previously assured that she no longer had to work with him.

181.     Ms. Cox informed Ms. Fitzgerald that she was no longer her HR representative and that going forward Ms. Fitzgerald had to contact Gabriella Valverde-Rivera, a Senior HR Manager.

182.     After Ms. Fitzgerald contacted Ms. Valverde-Rivera, she was forced to recount the incidents with Stiles for a third time.

183.     Subsequent to that conversation, Ms. Fitzgerald discussed the new working arrangement with Ms. Horn, who denied that the Company had previously promised that Ms. Fitzgerald would not have to work on projects with Stiles.

184.     Nevertheless, Ms. Valverde-Rivera stated that she would "look into it."

185.     Thereafter, Ms. Fitzgerald was approached by Mr. Agarwal, who stated that Ms. Fitzgerald being assigned to Stiles's projects was a "misunderstanding," that Stiles "spoke too soon," and that Ms. Fitzgerald "would not be working for him."

186.     Mr. Agarwal also took that opportunity to admonish Ms. Fitzgerald for speaking to HR without going to him first, stating: "I would have really appreciated that, if you were going to talk to HR, you should have come to me first."

187.     In August 2019, there was a reorganization in which Ms. Fitzgerald's team was restructured.

188.     The Program Managers, including Ms. Fitzgerald, were told by Mr. Clayton and Mr. Agarwal that they would be getting the title of Project Executive, and that there would be a lower title reserved for a new set of hires at a lower pay grade that would be assigned to handle administrative tasks.

189.     When the organization chart came out, Ms. Fitzgerald had her title listed as Associate Project Executive, which was a demotion from her title of Program Manager.

190.     Ms. Fitzgerald was upset about being demoted, and she told Mr. Agarwal that she felt she was being "passed around like the problem child."

191.     Ms. Fitzgerald met with Mr. Agarwal and said that she was frustrated, that she did not understand why her title was below her peers, that she did not believe she should have been demoted and that she felt like this was retaliation for her complaints.

192.     Ms. Fitzgerald asked if she had any performance deficiencies and requested feedback.

193.     In response, Mr. Agarwal tried to convince Ms. Fitzgerald that her new title was not a demotion and that it was a technicality tied to pay scale.

194.     Ms. Fitzgerald could see, however, that it was a clear demotion and asked "why am I doing the same work at same quality with my peers with a lesser title.  I don't feel that this is justified, and it looks like a demotion to my peers and feels that way to me."

195.     Notwithstanding Ms. Fitzgerald's point, Mr. Agarwal insisted that it was not a demotion and just a technicality.

196.     Ms. Fitzgerald then asked what her path to promotion could be.

197.     Mr. Agarwal told her that it was not "fair to give a promotion to you when some people have fifteen years of experience," even though multiple employees had the same level of experience as Ms. Fitzgerald and had higher pay and titles.

198.     On August 2, 2019, Ms. Horn contacted Ms. Fitzgerald to inquire about her prior complaints about Mr. Lowe.

199.     Ms. Horn stated that she could not tell her who made the complaint or what the situation was but that it had been recommended to her to contact Ms. Fitzgerald about Mr. Lowe's abusive and abrasive manner.

200.     In this conversation, Ms. Horn informed Ms. Fitzgerald that Ms. Horn had been given a message from Mr. Lowe to Ms. Fitzgerald that Ms. Horn viewed as abusive.

201.     Ms. Fitzgerald told Ms. Horn that she was not comfortable discussing Mr. Lowe because she knew that he was protected.

202.     Ms. Horn stated, "believe me, we know.  You are not the first person to say that. But I promise you will be safe discussing it with me."

203.     After this call, Ms. Fitzgerald gave Mr. Agarwal a courtesy call to inform him that he might be receiving a call from Ms. Horn about Mr. Lowe.

204.     Mr. Agarwal erupted in anger, asking "why?  I don't understand.  What did you do?"  Ms. Fitzgerald assured Mr. Agarwal that Ms. Horn had contacted her out of nowhere and that she had only given Ms. Horn his name because he had been involved with her complaint.

205.     In August 2019, Ms. Fitzgerald was assigned to yet another new Manager, Catie Delay.  At the time, Duong was made Ms. Delay's supervisor.

206.     Soon thereafter, Ms. Fitzgerald made it clear to Ms. Delay and Duong that she was unhappy with the team structure and would like the chance for a promotion and to be leveled with her peers.

207.     Nevertheless, Duong brushed off Ms. Fitzgerald's request, stating, "we will look into this when performance reviews come out."

208.     Because of these numerous reorganizations during Ms. Fitzgerald's employment at WeWork, she never received a performance review.

## VI.    Ms. Fitzgerald Faces Further Discrimination After Disclosing a Disability

209.     During Summer 2019, Ms. Fitzgerald began seeing a psychotherapist every Friday to deal with the anxiety and depression exacerbated by the hostile work environment she was experiencing at WeWork.

210.     Anxiety and depression are cognizable disabilities under the applicable statutes as they are serious medical conditions that impact several major life activities including the ability to work and to engage in daily life.

211.     During Fall 2019, Ms. Fitzgerald began working with the legal team on a major project because a client had stopped paying WeWork.

212.     Ms. Fitzgerald was put under immense stress due to the increased workload, and it caused her a large amount of anxiety, difficulty sleeping, and general unhappiness.

213.    During this time, Ms. Fitzgerald suffered a panic attack that rendered her unable to attend work for multiple days.

214.    Throughout Fall 2019, Ms. Fitzgerald indicated to Duong on multiple occasions that she was unhappy and experiencing a large amount of stress and anxiety.

215.    Then, in November 2019, WeWork instituted a round of layoffs.

216.    The message that was communicated to Ms. Fitzgerald and the entire Enterprise Services Department by Mr. Clayton, Mr. Agarwal and upper management was "be grateful you still have a job."

217.    In December 2019, there was a last-minute meeting scheduled.

218.    As a result, Ms. Fitzgerald disclosed to Duong that she had therapy and that if she was forced to cancel her appointment for the meeting, she would be charged hundreds of dollars. Ms. Fitzgerald was seeking therapy for the debilitating mental anguish she suffered as the result of a hostile work environment.

219.    Duong told her to "do what you have to do."

220.    In early January 2020, Ms. Fitzgerald met with Duong to have a one-on-one.

221.    Immediately, Duong started questioning Ms. Fitzgerald about why she was "unhappy."

222.    When Ms. Fitzgerald tried to respond, Duong repeatedly cut her off.

223.    Ms. Fitzgerald reiterated that because of the project she was working on with legal, she was very stressed, unable to sleep and that she did not feel supported by him.

224.    Duong continued to demean Ms. Fitzgerald by stating "why can't you be happier, why can't you be more appreciative?"

225.    Ms. Fitzgerald reiterated that she did not feel safe at WeWork.

226.     Duong became angry, stating "you are only giving me problems, not solutions. Why does this make you anxious?  Why do you take this home?  Why can't you separate it?"

227.     The next day, Ms. Fitzgerald spoke to Duong and disclosed to him what Stiles had done in May 2019, and the subsequent complaint she had made to HR.

228.     Ms. Fitzgerald told Duong that her interaction with Stiles and the response by HR and the Investigations Department made her uncomfortable at WeWork and that it affected her experience there.

229.     Duong then assured her that she would never be denied a promotion or terminated because of her complaints.  Unfortunately, this was not true.

230.     Still in early 2020, Ms. Fitzgerald received a three percent merit raise.

231.     Duong told Ms. Fitzgerald that it was the standard merit increase.

232.     Ms. Fitzgerald asked Duong again about her ability to receive a promotion.

233.     Duong told Ms. Fitzgerald once again that it was not the promotion cycle but that she would be informed when it was.

234.     Later, Ms. Fitzgerald learned that several of her peers received a raise in the amount of nine percent to ten percent.

235.     Prior to the office shutdown due to COVID-19, Ms. Fitzgerald's team was notified that there would be a restructuring and they would change from five small pods to two large pods.

236.     Duong showed Ms. Fitzgerald the edited organization chart and to her shock, Stiles had been placed in her team once again.

237.    Ms. Fitzgerald immediately spoke to Duong and stated that she was not comfortable being on the same team as Stiles given the prior incident of sexual harassment and asked what her options were.

238.    Concerned that Stiles would know he was moved because of Ms. Fitzgerald, she asked Duong to make the change discreetly.

239.    On March 13, 2020, as COVID-19 hit New York City, which was soon headed toward shutdown, Ms. Fitzgerald needed to be on site for a project handover.

240.    That same day, she had a one-to-one scheduled with Duong.

241.    Duong insisted that Ms. Fitzgerald come into the office after she was done at the worksite in order to have the meeting in person.

242.    Ms. Fitzgerald asked if they could reschedule the meeting and do it either via zoom or on the phone because the city was shutting down and she felt uncomfortable staying in the office.

243.    Duong insisted that she come back to the office.

244.    When Ms. Fitzgerald arrived, Duong proceeded to ask her many superfluous questions that did not involve pressing matters.  Soon thereafter, Ms. Fitzgerald informed Duong that she had a psychotherapy appointment at 3:30pm that day.

245.    Late in the afternoon, Ms. Fitzgerald asked again if she could leave for her psychotherapy appointment.

246.    In response, Duong insisted that WeWork was not shutting down and that Ms. Fitzgerald would be expected to be at the office the following week.

247.     Ms. Fitzgerald left in order to have her psychotherapy appointment from inside a phone booth at WeWork and informed Duong that she was not comfortable coming into the office under the circumstances and that she planned to work from home the following week.

248.     Duong insisted that he did not agree with her position and that he would be coming into the office.

249.     That weekend, New York City began shutting down.

**VI.    Ms. Fitzgerald is Unlawfully Terminated**

250.     Once the office had been shut down for COVID-19, Ms. Fitzgerald became increasingly concerned that her job would be at risk because of her complaints of sexual harassment and her disclosed disability.

251.     During this period, Ms. Fitzgerald asked Duong multiple times if her job was at risk.

252.     Duong responded every time, "we are all at risk all of the time."

253.     In mid-April 2020, Duong asked for Ashley Hohmann, Senior Associate Project Executive, who had just returned from maternity leave, to shadow Ms. Fitzgerald on a call.

254.     This was unusual to Ms. Fitzgerald, but she agreed, nonetheless, to help her colleague.

255.     On April 30, 2020, Ms. Fitzgerald received a calendar invite announcing a webinar later that day where she was terminated along with countless other WeWork employees.

256.     At the time of her termination, Ms. Fitzgerald was eligible for, and on a regimen of, intermittent medical leave that is protected under the FMLA in that she was taking time off work weekly to attend her psychotherapy appointments with the knowledge of her direct supervisor.

257.     That same day, WeWork cut-off all of Ms. Fitzgerald's access to her WeWork email account and her device.

258.     That night, Duong called Ms. Fitzgerald and offered to serve as a reference.

259.     Ms. Fitzgerald stated to Duong that she felt that her termination was retaliatory for her previous complaints.

260.     Duong stated that he could not comment on her termination but that it "was not personal."

261.     WeWork cynically used the pretext of a pandemic to fire Ms. Fitzgerald for speaking out to vindicate her rights in the workplace.

262.     Upon information and belief, Ms. Schroeder and subsequently Ms. Hohmann, took over all of Ms. Fitzgerald's ongoing projects.

263.     Upon information and belief, Stiles remains employed in the elevated position he received from WeWork after he had sexually harassed Plaintiff.

264.     Defendants' unlawful conduct and actions, as alleged herein, were severe or pervasive to the point of creating a hostile work environment for Plaintiff.

265.     Defendants' unlawful conduct and actions, as alleged herein, were intentional, egregious, violative of norms and principles inherent in a civil society and, thus, constitute aggravating circumstances that support an award of punitive damages.

**FIRST CAUSE OF ACTION**
**(Discrimination in Violation of the NYSHRL)**
***Against All Defendants***

266.     Plaintiff hereby repeats, reiterates, and re-alleges each and every allegation as contained in each of the preceding paragraphs as if fully set forth herein.

267.     By the actions described above, among others, Defendants discriminated against Plaintiff based on her gender and disability in violation of the NYSHRL, including, but not limited to, by subjecting Plaintiff to a hostile work environment, sexual harassment, and terminating Plaintiff's employment.

268.     As a direct and proximate result of the unlawful discriminatory conduct committed by Defendants in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, monetary and/or other economic harm for which she is entitled an award of monetary damages and other relief.

269.     As a direct and proximate result of the unlawful conduct committed by Defendants in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including, but not limited to, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which she is entitled to an award of monetary damages and other relief.

270.     Defendants' unlawful and discriminatory actions were done with willful negligence, or recklessness, or a conscious disregard of the rights of Plaintiff or conduct so reckless as to amount to such disregard of Plaintiff's protected rights under the NYSHRL, for which Plaintiff is entitled to an award of punitive damages.

## SECOND CAUSE OF ACTION
### (Retaliation in Violation of the NYSHRL)
### *Against All Defendants*

271.     Plaintiff hereby repeats, reiterates and re-alleges each and every allegation as contained in each of the preceding paragraphs as if fully set forth herein.

272.     By the actions described above, among other things, Defendants retaliated against Plaintiff for complaining about unequal treatment on the basis of her gender and her disability, as

well as seeking reasonable accommodation for her disability.  In so doing, Defendants subjected

Plaintiff to a hostile work environment and terminated Plaintiff's employment.  As a direct and

proximate result of the unlawful retaliatory conduct committed by Defendants in violation of the

NYSHRL, Plaintiff has suffered, and continues to suffer, monetary and/or other economic harm

for which she is entitled to an award of monetary damages and other relief.

273.    As a direct and proximate result of the unlawful retaliatory conduct committed by

Defendants in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, severe

mental anguish and emotional distress, including, but not limited to, humiliation, embarrassment,

stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for

which she is entitled to an award of monetary damages and other relief.

274.    Defendants unlawful and retaliatory actions were done with willful negligence, or

recklessness, or a conscious disregard of the rights of Plaintiff or conduct so reckless as to

amount to such disregard of Plaintiff's protected rights under the NYSHRL, for which Plaintiff is

entitled to an award of punitive damages.

**THIRD CAUSE OF ACTION**
**(Aiding and Abetting Discrimination and Retaliation under the NYSHRL)**
***Against Defendants Duong and Stiles***

275.    Plaintiff repeats and re-alleges each and every allegation in the preceding

paragraphs, as though fully set forth herein.

276.    Defendants Duong and Stiles knowingly or recklessly aided and abetted the

unlawful employment practices, including discrimination and retaliation, against Plaintiff in

violation of the NYSHRL.

277.    As a direct and proximate result, Plaintiff has suffered, and continues to suffer,

monetary and/or economic damages, including, but not limited to, loss of past and future income,

31

compensation and benefits, for which she is entitled to an award of monetary damages and other relief.

278.    As a direct and proximate result, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering, for which she is entitled to an award of compensatory damages and other relief.

279.    Defendant Duong's and Defendant Stiles's unlawful discriminatory and retaliatory actions constitute malicious, willful and wanton violations of NYSHRL, for which Plaintiff is entitled to an award of punitive damages.

**FOURTH CAUSE OF ACTION**
**(Discrimination in Violation of the NYCHRL)**
*Against All Defendants*

280.    Plaintiff hereby repeats and re-alleges each and every allegation in the preceding paragraphs, as though set forth fully herein.

281.    Defendants have discriminated against Plaintiff on the basis of her gender and disability in violation of the NYCHRL by subjecting Plaintiff to disparate treatment based upon her gender and disability, including, *inter alia*, subjecting her to a hostile work environment, sexual harassment, and terminating her employment.

282.    As a direct and proximate result of Defendants' unlawful and discriminatory conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, monetary and/or economic damages, including, but not limited to, loss of past and future income, compensation and benefits, for which he is entitled to an award of monetary damages and other relief.

283.    As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, mental anguish and emotional distress for which she is entitled to an award of monetary damages and other relief.

284.    Defendants' unlawful discriminatory conduct was intentional, done with malice and/or showed a deliberate, willful, wanton and reckless indifference to Plaintiff's rights under the NYCHRL, for which Plaintiff is entitled to an award of punitive damages.

285.    Defendant Duong's and Defendant Stiles's unlawful discriminatory and retaliatory actions constitute malicious, willful and wanton violations of NYCHRL, for which Plaintiff is entitled to an award of punitive damages.

### FIFTH CAUSE OF ACTION
**(Retaliation in Violation of the NYCHRL)**
*Against All Defendants*

286.    Plaintiff hereby repeats, reiterates and re-alleges each and every allegation as contained in each of the preceding paragraphs as if fully set forth herein.

287.    By the actions described above, among other things, Defendants retaliated against Plaintiff for complaining about unequal treatment on the basis of her gender and her disability, as well as seeking reasonable accommodation for her disability.  In so doing, Defendants subjected Plaintiff to a hostile work environment and terminated Plaintiff's employment.  As a direct and proximate result of the unlawful retaliatory conduct committed by Defendants in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, monetary and/or other economic harm for which she is entitled to an award of monetary damages and other relief.

288.    As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, monetary and/or other economic harm for which she is entitled to an award of monetary damages and other relief.

289.    As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including, but not limited to, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which she is entitled to an award of monetary damages and other relief.

290.    Defendants' unlawful and retaliatory actions were done with willful negligence, or recklessness, or a conscious disregard of the rights of Plaintiff or conduct so reckless as to amount to such disregard of Plaintiff's protected rights under the NYCHRL, for which Plaintiff is entitled to an award of punitive damages.

## SIXTH CAUSE OF ACTION
### (Aiding and Abetting Discrimination and Retaliation under the NYCHRL)
### *Against Defendants Duong and Stiles*

291.    Plaintiff repeats and re-alleges each and every allegation in the preceding paragraphs, as though fully set forth herein.

292.    Defendant Duong and Defendant Stiles knowingly or recklessly aided and abetted the unlawful employment practices, including discrimination and retaliation, against Plaintiff in violation of the NYCHRL.

293.    As a direct and proximate result, Plaintiff has suffered, and continues to suffer, monetary and/or economic damages, including, but not limited to, loss of past and future income, compensation, and benefits, for which she is entitled to an award of monetary damages and other relief.

294.    As a direct and proximate result, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and

emotional pain and suffering, for which she is entitled to an award of compensatory damages and other relief.

Defendant Duong's and Defendant Stiles's unlawful discriminatory and retaliatory actions constitute malicious, willful and wanton violations of NYCHRL, for which Plaintiff is entitled to an award of punitive damages.

**SEVENTH CAUSE OF ACTION**
**(Retaliation in Violation of the FMLA)**
***Against WeWork Only***

295.    Plaintiff repeats, reiterates and re-alleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

296.    At all times relevant herein,  WeWork was a "covered employer" within the meaning of the FMLA.  WeWork employs 50 or more employees in at least 20 calendar weeks within a 75-mile radius of the Company.

297.    Upon information and belief, at all times relevant herein,  Plaintiff was either actually or potentially eligible as a "covered employee" within the meaning of the FMLA because she worked full-time for approximately 57 weeks at WeWork before she was unlawfully terminated by the Company.

298.    Even if  Plaintiff was not yet eligible for FMLA leave on the date of her termination, WeWork violated the FMLA by interfering with Plaintiff's right to continue to take intermittent medical leave to obtain treatment for her disability because such leave would be covered under the FMLA.

299.    By the actions described above, among others, Defendant WeWork has retaliated against Ms. Fitzgerald for informing WeWork that she intended to avail herself of the rights and benefits of the FMLA.

300.     As a direct and proximate result of Defendant WeWork's unlawful retaliatory conduct in violation of the FMLA, Plaintiff has suffered, and continues to suffer, monetary and/or other economic harm for which she is entitled to an award of monetary damages, liquidated damages, reasonable attorneys' fees and expenses, and other relief.

**EIGHTH CAUSE OF ACTION**
**(Unlawful Interference in Violation of the FMLA)**
***Against WeWork Only***

301.     Plaintiff repeats, reiterates and re-alleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

302.     By the actions described above, among others, Defendant WeWork has unlawfully interfered with Ms. Fitzgerald's right to take FMLA leave and return to work from such leave by unlawfully terminating her employment.

303.     As a direct and proximate result of Defendant WeWork's unlawful conduct in violation of the FMLA, Plaintiff has suffered, and continues to suffer, monetary and/or other economic harm for which she is entitled to an award of monetary damages, liquidated damages, reasonable attorneys' fees and expenses, and other relief.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays that the Court enter judgment in her favor and against Defendants, containing the following relief:

A.     A declaratory judgment that the actions, conduct and practices of Defendants complained of herein violate the laws of the United States, the State of New York, and the City of New York;

B.     An injunction and order permanently restraining Defendants, officers, owners, agents, successors, employees and/or representatives, and any and all persons acting in concert

with them, from engaging in any such further unlawful conduct, including the policies and

practices complained of herein;

        C.      An award of damages against Defendants, or any jointly or severally liable entity

or person, in an amount to be determined at trial, plus prejudgment interest, to compensate

Plaintiff for all monetary and/or economic damages, including, but not limited to, loss of past

and future income, wages, compensation, seniority, and other benefits of employment;

        D.      An award of damages against Defendants, or any jointly or severally liable entity

or person, in an amount to be determined at trial, plus prejudgment interest, to compensate

Plaintiff for all non-monetary and/or compensatory damages, including, but not limited to,

compensation for her mental anguish and emotional distress, as well as damage to her reputation,

under applicable law;

        E.      An award of damages for any and all other monetary and/or non-monetary losses

suffered by Plaintiff, including, but not limited to, loss of income, earned bonus pay, reputational

harm and harm to professional reputation, in an amount to be determined at trial;

        F.      An award of punitive damages and any applicable penalties (including liquidated

damages) in an amount to be determined at trial;

        G.      Prejudgment interest on all amounts due;

        H.      An award of fees and costs that Plaintiff has incurred in this action, including, but

not limited to, expert witness fees, as well Plaintiff's reasonable attorneys' fees and costs to the

fullest extent permitted by law; and,

        I.      Such other and further relief as the Court may deem  just and proper.

## <u>JURY DEMAND</u>

Plaintiff hereby demands a trial by jury on all issues of fact and damages stated herein.

Dated: July 9, 2020
       New York, New York               Respectfully Submitted,

                                      **WIGDOR LLP**

By: _____
                    Parisis G. Filippatos
                    Lindsay M. Goldbrum

85 Fifth Avenue
New York, NY 10003
Telephone: (212) 257-6800
Facsimile: (212) 257-6845
pfilippatos@wigdorlaw.com
lgoldbrum@wigdorlaw.com

*Counsel for Plaintiff*