UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ALEXANDRIA FITZGERALD,

                             Plaintiff,

          -against-

THE WE COMPANY d/b/a WEWORK and
DAVID STILES, in their Individual and
professional capacities,

                             Defendants.

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:  3/30/2022
```

20 Civ. 5260 (AT)

**ORDER**

ANALISA TORRES, United States District Judge:

Plaintiff, Alexandria Fitzgerald, brings this action against Defendants We Work Management LLC[1] ("WeWork"), and its employee, David Stiles,[2] alleging that they discriminated and retaliated against her on the basis of gender and disability, in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e, *et seq.*, the Americans with Disabilities Act (the "ADA"), 42 U.S.C. § 12101 *et seq.*, the New York State Human Rights Law (the "NYSHRL"), N.Y. Exec. L. § 290 *et seq.*, and the New York City Human Rights Law (the "NYCHRL"), N.Y.C. Admin. Code § 8-107 *et seq.*  Am. Compl. ¶ 2, ECF No. 23.  Fitzgerald also alleges that WeWork's termination of her employment violated the Family and Medical Leave Act (the "FMLA"), 29 U.S.C. § 2601 *et seq.  Id.* ¶¶ 2, 295–303.

Defendants move for summary judgment.  Defs. Mot., ECF No. 41.  For the reasons stated below, the motion is GRANTED as to Fitzgerald's claims under Title VII, the ADA, and the FMLA.  The Court declines to exercise supplemental jurisdiction over Fitzgerald's remaining

---

[1] The caption incorrectly refers to Fitzgerald's employer as the "The We Company d/b/a WeWork."  *See* Am. Compl., ECF No. 23.  The correct name is "We Work Management LLC."  Defs. Mem. at 1, 2 n.1, ECF No. 42.

[2] Fitzgerald also initially named Danny Duong as a defendant in this action.  However, Fitzgerald withdrew her claims against him, "agree[ing] that there is insufficient proof" that Duong was a participant in the alleged harassment or termination decisions, Pl. Opp'n. at 31 n.17, ECF No. 50, and subsequently dismissed with prejudice her claims against Duong by stipulation, ECF No. 56.

NYSHRL and NYCHRL claims, and those claims are, accordingly, DISMISSED without prejudice to renewal in state court.

## BACKGROUND[3]

WeWork provides office space for companies worldwide.  Defs 56.1 ¶ 1, ECF No. 43.  Alexandria Fitzgerald began working for WeWork on March 25, 2019, as a Senior Lead Program Manager in the Program Management Organization ("PMO").  *Id.* ¶ 2.

I.   <u>Stiles</u>

From May 10–11, 2019, Fitzgerald traveled to Kansas City, Missouri, to check on issues at a client's project site.  *Id.* ¶ 72.  Akash Agarwal, a Regional Head in the department, asked David Stiles, another Senior Lead, to accompany Fitzgerald on the trip.  *Id.* ¶¶ 19, 73–74.

On May 13, 2019, when Fitzgerald returned from the trip, she informed her supervisor, Nicole Rodriguez, that she had an "uncomfortable" situation with Stiles in Kansas City.  *Id.* ¶ 78.  Rodriguez escalated Fitzgerald's complaint to Agarwal, who in turn, brought in WeWork's People team (akin to a human resources department).  *Id.* ¶¶ 80–83.  The next day, the People team began an investigation into the matter, led by Maria Cox, a People Partner, and Alissa Horn, WeWork's Director of Investigations and Employee Relations.  Defs. 56.1 ¶¶ 90–91, 108.  On May 15, 2019, Cox interviewed Fitzgerald.  *Id.* ¶ 96.  According to Cox's contemporaneous interview notes, Fitzgerald told Cox that during dinner in Kansas City, Stiles asked her whether she had a boyfriend, and in response to her stating that she "wanted to settle down," he told her to "bang a few out before [she] get[s] into a relationship."  *Id.* ¶ 98.  Stiles also wiped barbecue

---

[3] The facts in this section are taken from the parties' 56.1 statements, unless otherwise noted.  Citations to a paragraph in the Rule 56.1 statement also include the other party's response.  The Court considers admitted for purposes of the motion any paragraph that is not specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party.  Local Civ. R. 56.1(c).  Where there are no citations, or where the cited materials do not support the factual assertions in the statements, the Court may disregard the assertion.  *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73 (2d Cir. 2001).

sauce off Fitzgerald's face with a napkin. *Id.* ¶ 104.  After dinner, Stiles returned to his hotel

room, and Fitzgerald went out for a drink. *Id.* ¶ 100.  Fitzgerald initiated a text conversation with

Stiles, during which Stiles texted her "lol, want to cuddle." *Id.* ¶ 101.  Fitzgerald responded, but

did not address the request.  ECF No. 49-16 at 11.  Stiles later texted "I still did not get an

answer on the cuddling" with a tongue emoji. *Id.* at 12.  Fitzgerald responded later that evening

"Phone died while I was out.  No cuddling for me[.]" *Id.* at 13.

On May 17, 2019, Horn interviewed Stiles, who admitted to the behavior Fitzgerald

described.  Defs. 56.1 ¶¶ 112–16.  Horn issued a report, finding that Stiles' comments were

"inappropriate, unprofessional[,] and in violation of [WeWork's] Workplace Violence &

Harassment Policy," and recommended he receive a "final written warning."  ECF No. 52-21 at

1, 5.  On May 22, 2019, Cox and Agarwal met with Stiles to deliver the warning, which, among

other things, directed Stiles to fully comply with applicable WeWork policies on workplace

harassment, and warned that any further violations "will result in [his] immediate separation

from WeWork."  Defs. 56.1 ¶¶ 129–32.  Following the issuance of the warning, Stiles did not

engage in any further inappropriate behavior towards Fitzgerald. *Id.* ¶ 149; *see also* Fitzgerald

Tr. at 186, ECF No. 49-3.  And, for the duration of Fitzgerald's employment, Stiles remained in

a different "pod" of the department, reporting to a different supervisor.  Defs. 56.1 ¶ 27.

Fitzgerald contends, however, that Stiles continued to "[make] inappropriate comments at team

meetings as jokes," Fitzgerald Tr. at 186–87; and that he exhibited inappropriate behavior,

including touching a female colleague's breast, *id.* at 187–88; "hit[ting] on" a client during a

business meeting by asking for her relationship status, *id.* at 187, 191–92, and referring to a

female colleague as a "stripper," *id.* at 188.

II.   Fitzgerald's Therapy Sessions

In June 2019, Fitzgerald began attending therapy appointments for her anxiety, typically between 3:00 and 5:00 p.m. on weekdays.  *Id.* at 110–11, 231; Defs. 56.1 ¶ 150.  She did not seek permission to attend her therapy appointments; rather, she generally would tell a supervisor that she was leaving for the appointment and would return to the office afterwards.  Defs. 56.1 ¶ 151; *see also* Fitzgerald Tr. at 111.  For instance, on November 1, 2019, Fitzgerald informed Duong, her supervisor at the time, *see* Fitzgerald Tr. at 34, that she had a therapist appointment she could not move, but she explained that she could "come back right after" and asked Duong to "help play defense for [her] if any meetings pop up" while she was gone, ECF No. 49-18 at 27.  Similarly, Fitzgerald told Agarwal, Rodriguez, and another supervisor, Catie Delay, that she would put a "block in [her] calendar" and silence her phone for therapy appointments, and that she would return to the office when they were completed.  Fitzgerald Tr. at 111–14.  Agarwal responded that Fitzgerald should "take care of whatever [she] need[ed] to do."  *Id.* at 113.  And, Rodriguez told Fitzgerald she was "proud of [Fitzgerald] for getting help."  *Id.* at 111–12.

Fitzgerald could not recall any instances in which Rodriguez, Agarwal, or Delay prevented her from attending a scheduled therapy appointment or made disparaging comments about her attending therapy.  *Id.* at 114–15.  And, although Fitzgerald believes there were times when Duong requested that she move her therapy appointments if possible, she did not recall any specific occasions when she had been required to cancel her appointment at Duong's request.  *See id.* at 106–10.

III.   WeWork's Reduction-in-Force and Fitzgerald's Termination

Beginning in 2019, following a failed IPO attempt and changes in senior leadership, WeWork went through multiple reorganizations and reductions-in-force ("RIFs").  *See* Defs.

56.1 ¶¶ 21, 23, 29, 31, 69–71.  In the summer of 2019, Fitzgerald's PMO group was combined

with the Client Services group to form a new "Enterprise Services" ("ES") department.  Defs.

56.1 ¶ 6.  Prior to the merger, Client Services focused on the pre-deal, sales phase of projects,

and PMO focused on post-deal project execution for clients.  Defs. 56.1 ¶¶ 8–9.  Fitzgerald, like

every other employee in the new ES department, received a title change—in her case, to

Associate Project Executive, and she gained some additional responsibilities.  *Id.* ¶¶ 14–17.  Her

job level and compensation, however, remained unchanged.  *Id.* ¶ 16.  In November 2019,

WeWork conducted an RIF that led to the elimination of 2,400 positions, or roughly 20% of their

workforce, including employees in Fitzgerald's role.  *Id.* ¶¶ 21, 23–24.

     In early 2020, Ivan Kondili, the co-head of ES, was told to start planning for additional

layoffs (the "April 2020 RIF").  *Id.* ¶ 30.  In light of changing organizational priorities within ES,

Kondili sought to retain employees with "deeper, hands-on experience in budgeting, contracting,

and construction," and expertise in technical areas like construction methodology, to ensure that

remaining employees "were equipped, with fewer resources than before, to handle the end-to-end

client experience."  Kondili Decl. ¶¶ 16–18, ECF No. 47; *see also* Kondili Tr. at 74–75, ECF No.

49-1.  Kondili did not base layoff decisions on a "performance assessment," but instead asked his

direct reports—including Agarwal—to identify employees in their reporting lines who lacked the

"caliber and skill sets" employees would need to demonstrate moving forward.  Defs. 56.1

¶¶ 38–41; Kondili Tr. at 68–69, 74–75.

     As part of his assessment of his team's abilities, Agarwal reviewed employees' resumes

to assess whether their experience and skills were sufficient.  *See* Agarwal Tr. at 59–60, ECF No.

49-5.  He then recommended seven employees, ranked from least to most likely to be successful

in the new, leaner organization given their background and expertise, for inclusion in the April

2020 RIF.  The three candidates ranked "least likely to succeed" including Fitzgerald, were all Associate Project Executives who had formerly been in the PMO side of ES.  Agarwal Tr. at 168–69.  Agarwal concluded that these employees' skills were largely in project execution, and that they lacked the technical and contracting skills needed to manage a client in the pre-deal stages of a project.  *Id.* at 59–60, 168–72; Defs. 56.1 ¶ 53, Agarwal Decl. ¶ 6, ECF No. 44.

Kondili then chose five of the seven employees on Agarwal's list for layoffs, based on both Agarwal's input and Kondili's own experience with each employee.  Defs. 56.1 ¶ 56; Kondili Tr. at 71–73.  He decided to fire all three remaining U.S.-based Associate Project Executives—including Fitzgerald.  Defs. 56.1 ¶ 57; *see also* Kondili Tr. at 96–100.  Based on Kondili's eighteen years of construction experience and the conversations he had with Fitzgerald, he determined that Fitzgerald lacked "the construction technical knowledge that she needed" to be successful moving forward.  Kondili Tr. at 70–73.  Kondili also laid off Kim Koo, a female Proposal Manager, and Pierce Reynoldson, a male Project Executive, ranked fifth and sixth least likely to succeed, respectively.  Defs. 56.1 ¶ 56.  Kondili retained Hayley Whitfield, a female Project Executive, and Jacob Riedel, a male Pod Director, ranked fourth and seventh least likely to succeed, respectively.  *See id.* ¶¶ 47, 51, 56.

In total, WeWork eliminated 300 employees, including eleven positions in ES.  Defs. 56.1 ¶ 65.  The April 2020 RIF eliminated Fitzgerald's role entirely, and WeWork has not had any Associate Project Executives in ES since then.  *Id.* ¶ 58.  WeWork went through at least two more RIFs, in June and October 2020.  *Id.* ¶¶ 69–70.  As a result, ES shrunk from 250 employees at its peak to approximately twenty employees today.  *Id.* ¶ 71.

**DISCUSSION**

I. <u>Legal Standard</u>

Summary judgment is appropriate when the record shows that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–26 (1986). A genuine dispute exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248. The moving party initially bears the burden of informing the Court of the absence of a genuine dispute of material fact by citing particular evidence in the record. Fed. R. Civ. P. 56(c)(1); *Celotex*, 477 U.S. at 323–24; *Koch v. Town of Brattleboro*, 287 F.3d 162, 165 (2d Cir. 2002). If the non-moving party has the ultimate burden of proof on specific issues at trial, the movant may also satisfy its own summary judgment burden by demonstrating that the adverse party cannot produce admissible evidence to support an issue of fact. *Celotex*, 477 U.S. at 322–23; *PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 105 (2d Cir. 2002) (per curiam).

If the moving party meets its initial burden, the burden then shifts to the opposing party to establish a triable issue of fact. *Beard v. Banks*, 548 U.S. 521, 529 (2006); *PepsiCo*, 315 F.3d at 105. In doing so, the non-moving party "may not rely on conclusory allegations or unsubstantiated speculation," *Scott v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998) (citation omitted), as "unsupported allegations do not create a material issue of fact," *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000) (citation omitted). In deciding the motion, the Court views the record in the light most favorable to the non-moving party. *Koch*, 287 F.3d at 165.

7

The Court must be "cautious about granting summary judgment to an employer in a discrimination case when the employer's intent is in question," and must "carefully scrutinize[]" the non-movant's affidavits and depositions for "circumstantial proof which, if believed, would show discrimination." *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997) (quotation marks and citation omitted). That said, summary judgment is warranted if the opposing party "relies on conclusory allegations of discrimination and the employer provides a legitimate rationale for its conduct." *Figueroa v. N.Y. Health and Hosps. Corp.*, 500 F. Supp. 2d 224, 228 (S.D.N.Y. 2007) (quotation marks and citation omitted). To defeat summary judgment, the opposing party must set forth "concrete evidence from which a reasonable juror could return a verdict in [its] favor." *Anderson*, 477 U.S. at 256.

II.   <u>Gender Discrimination</u>

Fitzgerald raises claims of gender-based discrimination, retaliation, and a hostile work environment under Title VII, the NYSHRL, and the NYCHRL, citing the sexual harassment she experienced from Stiles and her termination. *See, e.g.*, Am. Compl. ¶¶ 267, 272, 310. The Court addresses each claim separately.

    A.  Hostile Work Environment

Under Title VII, sexual harassment is cognizable as gender discrimination, and may be analyzed as a hostile work environment claim. *Anderson v. Davis Polk & Wardwell LLP*, 850 F. Supp. 2d 392, 403 (S.D.N.Y. 2012). To state a hostile work environment claim under Title VII, a plaintiff must put forth evidence showing that her workplace was "permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive work environment." *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993) (quotation marks and citations omitted). She must also

show that the complained-of conduct creates such an environment because of her gender. *Patane v. Clark*, 508 F.3d 106, 113 (2d Cir. 2007).  Defendants argue that Fitzgerald has failed to establish a *prima facie* case of a hostile work environment based on Stiles' inappropriate—but limited—conduct towards her.  Defs. Mem. at 12–13.  The Court agrees.

Isolated incidents "usually will not suffice to establish a hostile work environment, although . . . even a single episode of harassment can establish a hostile work environment if the incident is sufficiently severe."  *Redd v. New York Div. of Parole*, 678 F.3d 166, 175–76 (2d Cir. 2012) (quotation marks omitted).  A plaintiff must, therefore, demonstrate "either that a single incident was extraordinarily severe, or that a series of incidents were sufficiently continuous and concerted to have altered the conditions of her working environment."  *Howley v. Town of Stratford*, 217 F.3d 141, 153 (2d Cir. 2000) (citation omitted).  For instance, courts have found that a single instance of sexual assault qualifies as "extraordinarily severe" for purposes of establishing a hostile work environment claim.  *See Domingues v. Barton Chevrolet Cadillac*, No. 18 Civ. 7772, 2021 WL 637016, at *4–5 (S.D.N.Y. Feb. 17, 2021) (collecting cases).

Here, Fitzgerald describes an isolated instance in which, over the span of an evening, Stiles made comments about her relationship status, including encouraging her to "bang a few out," and "have a bunch of one-night stands," briefly touched her face, and, during a text exchange, twice asked her to "cuddle" in his hotel room, punctuated with a tongue emoji—a sexually suggestive image.  Defs. 56.1 ¶¶ 98, 100–01, 104; *see also* ECF No. 49-16 at 12. Although Stiles' comments could be construed as vulgar and inappropriate, the Court does not find that these comments and propositions, standing alone, are sufficiently "severe and pervasive" as to establish a hostile work environment claim.  *Compare Howley*, 217 F.3d at 154 (single instance of verbal abuse created hostile work environment where offender went on a

"tirade" about female plaintiff being promoted for performing fellatio, "at length" and "loudly" in front of large group of male subordinates), *with Mormol v. Costco Wholesale Corp.*, 364 F.3d 54, 58–59 (2d Cir. 2004) (two instances of supervisor propositioning employee for sex in one month did not establish hostile work environment claim).

Moreover, Fitzgerald does not adduce admissible evidence that Stiles' behavior following the trip was sufficiently "continuous and concerted [as] to have altered the conditions of her working environment." *Howley*, 217 F.3d at 153. Fitzgerald concedes that, after Stiles was reprimanded, he did not direct any further inappropriate behavior towards her. Fitzgerald Tr. at 186. And, although Fitzgerald levels more serious allegations at Stiles—including that he touched a co-worker's breast and made advances on a client, *id.* at 186–92—she offers only inadmissible hearsay in support of these claims, which does not establish a triable issue of fact, *see Weinstock*, 224 F.3d at 44. At best, Fitzgerald adduces admissible evidence that Stiles occasionally made inappropriate, isolated jokes in group settings. Fitzgerald Tr. at 187–88. But, this does not rise to the level of severe and pervasive conduct necessary to establish a hostile work environment claim. Stiles' actions, accordingly, "are sufficiently isolated and discrete that a trier of fact could not reasonably conclude they pervaded [Fitzgerald's] work environment." *Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 768 (2d Cir. 1998). Accordingly, Defendants' motion for summary judgment on Fitzgerald's Title VII hostile work environment claim is GRANTED.[4]

---

[4] The Court notes, however, that under the more liberal provisions of the NYCHRL, conduct that does not qualify as "severe or pervasive" may still support a hostile work environment claim because "questions of 'severity' and 'pervasiveness' are applicable to consideration of the scope of permissible damages, but not to the question of underlying liability." *Williams v. New York City Hous. Auth.*, 872 N.Y.S.2d 27, 38 (1st. Dept. 2009) (citation omitted). Indeed, "[w]hether a statement or incident is isolated is irrelevant under the NYCHRL." *Holohan v. Newmark & Co. Real Estate Inc.*, No. 18 Civ. 6275, 2019 WL 4743883, at *4 (S.D.N.Y. Sept. 16, 2019) (quotation marks and citation omitted). Although Fitzgerald has not met the threshold to prevail on her federal hostile work environment claim under Title VII, she might prevail on a parallel cause of action under the NYCHRL. The Court,

B. Discriminatory Discharge

Fitzgerald argues that WeWork "discriminated against [her] on the basis of her gender . . . by subjecting her to disparate treatment, including . . . terminating her employment." Am. Compl. ¶ 305. Discriminatory discharge claims under Title VII are subject to the three-part burden-shifting framework described in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973). To establish a *prima facie* case, a plaintiff must show that "(1) she is a member of a protected class; (2) she is qualified for her position; (3) she suffered an adverse employment action; and (4) the circumstances give rise to an inference of discrimination." *Weinstock*, 224 F.3d at 42 (citing *McDonnell Douglas*, 411 U.S. at 802). The burden then shifts to the defendant to demonstrate a "legitimate, non-discriminatory reason" for the employment action. *Tex. Dep't of Comm. Affs. v. Burdine*, 450 U.S. 248, 254 (1981). Such a proffer causes the "presumption of discrimination arising with the establishment of the *prima facie* case [to] drop[] from the picture." *Weinstock*, 224 F.3d at 42. The plaintiff must then adduce "sufficient evidence to support a rational finding that the legitimate, non-discriminatory reasons proffered by the [defendant] were false, and that more likely than not [discrimination] was the real reason for the [employment action]." *Van Zant v. KLM Royal Dutch Airlines*, 80 F.3d 708, 714 (2d Cir. 1996) (citation omitted).

Defendants argue that Fitzgerald "cannot show that WeWork discharged her under circumstances giving rise to an inference of gender discrimination." Defs. Mem. at 22. The Court agrees. In the absence of direct evidence of discrimination—which Fitzgerald does not adduce[5]—she may raise an inference of discrimination by demonstrating disparate treatment, that

---

however, declines to exercise supplemental jurisdiction over Fitzgerald's NYCHRL claim, *see infra* at 23–24, and, accordingly, does not address the merits of this cause of action here.

[5] Stiles had no involvement or input in the decision to include Fitzgerald in the RIF, and, thus, his actions do not provide a basis to infer discriminatory intent in WeWork's decision to terminate her. *See Suri v. Grey Global Grp.,*

is that she was treated "less favorably than a similarly situated employee outside [her] protected group." *Ruiz v. Cty. of Rockland*, 609 F.3d 486, 493 (2d Cir. 2010) (citation omitted).  To make such a showing, Fitzgerald must allege that she was "similarly situated in all material respects to the individuals with whom she seeks to compare herself." *Brown v. Daikin Am. Inc.*, 756 F.3d 219, 230 (2d Cir. 2014) (quotation marks and citations omitted); *see also McGuinness v. Lincoln Hall*, 263 F.3d 49, 54 (2d Cir. 2001).  She may also raise an inference of discrimination by demonstrating a disparate impact through statistical evidence showing that "male employees were more likely to survive [the April 2020] RIF." *Vuona v. Merrill Lynch & Co., Inc.*, 919 F. Supp. 2d 359, 371–72 (S.D.N.Y. 2013).

Fitzgerald has failed to show disparate treatment and impact.  As to disparate treatment, Fitzgerald does not identify a male comparator who was similarly situated to her in all material respects.  The single male employee who survived the RIF—Riedel—was a "manager" in a more senior role, *see* Pl. Opp'n at 7, 23; Defs. 56.1 ¶ 51 (identifying Riedel as a "pod director").  Fitzgerald does not demonstrate that Riedel—or any other male employee not terminated in the RIF—was subject to the same performance or evaluation standards as Fitzgerald, that they shared a supervisor, or that their positions were "sufficiently similar . . . to support at least a minimal inference that the difference in treatment may be attributable to discrimination." *McGuinness*, 263 F.3d at 54; *see also Brown*, 756 F.3d at 230 (finding employees similarly situated where they worked in the same group, reported to the same supervisor, and were subject to the same performance evaluation standards).  And, the April 2020 RIF eliminated *all* U.S.-

---

*Inc.*, 83 N.Y.S.3d 9, 6 (N.Y. App. Div. 2018) (where plaintiff was eliminated through RIF, and her employer's decision to terminate her "was not made by [alleged harasser], nor was it made in consultation with him," his actions did not constitute evidence that "her termination was motivated by discrimination.")

based employees in Fitzgerald's role and department, Defs. 56.1 ¶ 58—which does not support the existence of a male comparator who received more favorable treatment.

Similarly, Fitzgerald's statistical evidence is insufficient to demonstrate disparate impact. Seven employees—five women and two men—were considered for termination in the RIF, of which four women and one man were ultimately let go.  Defs. 56.1 ¶¶ 43–51, 55–56.  The "small sample size" at issue "renders this statistical evidence practically meaningless," particularly when Fitzgerald has not adduced any evidence as to ES's demographics as a whole, or the percentages of men and women laid off in the RIF.  *Coleman v. Prudential Relocation*, 975 F. Supp. 234, 240 (W.D.N.Y. 1997) (collecting cases).  Because Fitzgerald has not established an inference of discriminatory intent in connection with her inclusion in the April 2020 RIF, she has not made a *prima facie* case for her discriminatory discharge claim.

Even assuming Fitzgerald established a *prima facie* case, Defendants have put forth legitimate, non-discriminatory business reasons for her termination.  The April 2020 RIF eliminated hundreds of positions, including all remaining U.S.-based employees in Fitzgerald's role and department.  Defs. 56.1 ¶¶ 58, 65; Kondili Decl. ¶ 26.  "A[n] RIF can indeed provide a legitimate, non-discriminatory reason for a termination," *Vuona*, 919 F. Supp. 2d at 373, particularly when all employees in the plaintiff's role are let go.  *Garcia v. Barclays Capital, Inc.*, 281 F. Supp. 3d 365, 379–80 (S.D.N.Y. 2017).  Kondili prioritized retaining employees with substantive experience in "budgeting, contracting, and construction," specific technical skills in construction management, and the ability to manage a client through both the pre-deal and execution stages of a project.  Defs. 56.1 ¶¶ 30–33; Kondili Decl. ¶¶ 16–18.  He chose to fire Fitzgerald—and the two remaining ES employees in the same "junior-level role," Fitzgerald Tr. at 221—because he determined they lacked these skills.  Defs. 56.1 ¶¶ 53, 56–57.  Defendants

are entitled to "discharge an employee on the basis of subjective business judgments, for any reason that is not discriminatory," and it is not the Court's role to second-guess such business decisions. *Risco v. McHugh*, 868 F. Supp. 2d 75, 105 (S.D.N.Y. 2012).

Fitzgerald offers no evidence of pretext to rebut Defendants' non-discriminatory rationale for her termination. She "vehemently disagrees with Defendants' assessment of [her] performance and the decision to select [her] as one of the . . . weakest employees of the group, [but] this does not show pretext." *Pearson v. Lynch*, No. 10 Civ. 5119, 2012 WL 983546, at *10–11 (S.D.N.Y. Mar. 22, 2012). Accordingly, Defendants' motion for summary judgment on Fitzgerald's Title VII gender-based discriminatory discharge claim is GRANTED.

## C. Retaliation

Fitzgerald alleges that she was fired in retaliation for her complaints about Stiles, in violation of Title VII. Am. Compl. ¶¶ 310. As with discriminatory discharge claims, Title VII retaliation claims are subject to the *McDonnell Douglas* burden-shifting framework. To establish a *prima facie* case of retaliation, a plaintiff must show that (1) she engaged in a protected activity by opposing a practice made unlawful by Title VII; (2) her employer was aware of that activity; (3) she suffered a materially adverse employment action;[6] and (4) there was a causal connection between the protected activity and the adverse employment action. *See Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 173 (2d Cir. 2005). The burden then shifts to the employer to show that the "adverse employment actions were taken for a legitimate, non-

---

[6] In addition to citing her termination, Fitzgerald argues that she was "demoted" in August 2019, three months after her complaint. Pl. Opp'n at 7–8, 25; Fitzgerald Tr. at 220–23. It is undisputed that, at that time, Fitzgerald's group was reorganized, and she—like every other employee in the new group—received a title change. Fitzgerald Tr. at 220–23; Defs. 56.1 ¶¶ 14–15. But, Fitzgerald has not shown that she experienced any "materially adverse changes" as a result of this reorganization, such as a salary decrease, a material loss of benefits, or diminished responsibilities. *Chung v. City Univ. of New York*, 605 F. App'x 20, 22 (2d Cir. 2015); *see also* Defs. 56.1 ¶¶ 16–17. "The law does not support a claim that a title change, with no change in salary or benefits, is considered an adverse employment action." *White v. Fuji Photo Film USA, Inc.*, 434 F. Supp. 2d 144, 152–53 (S.D.N.Y. 2006). Accordingly, the alleged "demotion" does not constitute an adverse employment action for purposes of Fitzgerald's retaliation claim.

retaliatory reason." *Giscombe v. N.Y.C. Dep't of Educ.*, 39 F. Supp. 3d 396, 401 (S.D.N.Y. 2014) (quotation marks, citation, and alterations omitted).  If the employer makes such a showing, the plaintiff must prove "that the desire to retaliate was the but-for cause of the challenged employment action." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013).  That is, Fitzgerald must show that "the adverse action would not have occurred in the absence of the retaliatory motive." *Vega v. Hempstead U. Free Sch. Dist.*, 801 F.3d 72, 91 (2d Cir. 2015) (citation omitted).

Even assuming that Fitzgerald establishes the first three elements of a *prima facie* case of retaliation, the Court finds that Fitzgerald has not shown a causal connection between her complaint about Stiles and her firing.  A causal connection can be established by showing either "that the retaliatory action was close in time to the protected activity; that other similarly situated employees were treated differently; or with direct proof of retaliatory animus." *Uddin v. City of New York*, 427 F. Supp. 2d 414, 432 (S.D.N.Y. 2006).  Fitzgerald has failed to adduce the requisite direct proof, arguing merely that it is "uncontested" that she was "fired less than a year" after complaining about Stiles' sexual harassment, and that this sequence of events establishes causality.  Pl. Opp'n at 25.  The Court disagrees.

Although the Second Circuit has not set forth a specific time period "between protected activity and adverse employment action that defeats an inference of causation," *Burkybile v. Bd. of Educ. of Hastings–On–Hudson Union Free Sch. Dist.*, 411 F.3d 306, 314 (2d Cir. 2005), courts in this Circuit have generally concluded that a gap of more than three months between the protected activity and the retaliatory action "is insufficient, standing alone," to establish a causal connection, *see*, *e.g.*, *Chukwueze v. NYCERS*, 891 F. Supp. 2d 443, 457–58 (S.D.N.Y. 2012) (collecting cases); *Vuona*, 919 F. Supp. 2d at 383 (finding nine-month gap between internal

complaint and RIF "outside the time frame traditionally considered to allow for an inference of causation.").

Fitzgerald also claims that she reiterated her concerns about Stiles to Duong around "late December or early January"—roughly four months before she was discharged.  Fitzgerald Tr. at 89–91.  Even assuming both that this constitutes a "protected activity," and that it was sufficiently temporally proximate to Fitzgerald's termination to establish causality, her claim still fails.  Defendants have adduced a legitimate, non-discriminatory reason for Fitzgerald's termination—namely, an RIF that eliminated every employee in her role.  Defs 56.1 ¶¶ 58, 65. In response, Fitzgerald offers no evidence to suggest her complaint was the "but-for" cause of her termination.  And, although temporal proximity may be sufficient on its own to establish a *prima facie* case of retaliation, it does not establish pretext at the summary judgment stage.  *See Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 847 (2d Cir. 2013).  Fitzgerald cannot, therefore, prevail on a retaliation claim under Title VII, and Defendants' motion for summary judgment on this claim is, accordingly, GRANTED.

III.    Disability Discrimination

Fitzgerald argues that WeWork discriminated against her on the basis of her disability by terminating her employment after she sought an accommodation—time off to attend therapy sessions for her anxiety.  *E.g.*, Am. Compl. ¶ 315.  She brings claims for discriminatory discharge, retaliation, and hostile work environment on the basis of disability under the ADA. *Id.*

Fulfilling the ADA's statutory definition of a disability is a "significant threshold for seeking redress under the ADA."  *Felix v. New York City Transit Auth.*, 324 F.3d 102, 107 (2d Cir. 2003).  Defendants argue that Fitzgerald's ADA claims should be dismissed, because she

has not established that she has a "disability" within the meaning of the ADA.  Defs. Mem. at

26–27.  The Court agrees.

A plaintiff claiming disability under the ADA must (1) show that she suffers from a

physical or mental impairment; (2) identify the activity claimed to be impaired, and establish that

it constitutes a major life activity; and (3) show that her impairment "substantially limits" the

major life activity in question.  *Weixel v. Bd. of Educ. of City of New York*, 287 F.3d 138, 147 (2d

Cir. 2002) (citation omitted).

Fitzgerald states that she is "disabled in her sleeping and cognitive functions" because of

anxiety.  Fitzgerald Decl. ¶ 2, ECF No. 53.  Although generalized anxiety disorder has been

"recognized as constituting [an] impairment[] under the ADA," *Cody v. Cty. of Nassau*, 577 F.

Supp. 2d 623, 640 (E.D.N.Y. 2008), *aff'd* 345 F. App'x 717 (2d Cir. 2009), the "mere allegation

that plaintiff had difficulty sleeping is not sufficient to show a substantial limitation in [a] major

life activity," *Baker v. CSX Transp., Inc.*, 546 F. Supp. 2d 90, 98 (W.D.N.Y. 2008) (citation

omitted); *cf. Felix v. New York City Transit Auth.*, 154 F. Supp. 2d 640, 654 (S.D.N.Y. 2001).

Fitzgerald makes "no showing that [her] affliction is any worse than is suffered by a large

portion of the nation's adult population."  *Colwell v. Suffolk Cty. Police Dep't*, 158 F.3d 635, 644

(2d Cir. 1998).  Similarly, Fitzgerald's statement that she is "disabled in . . . cognitive functions,"

Fitzgerald Decl. ¶ 2, supported by nothing more than her own affidavit, is too "[v]ague,

conclusory, and self-serving" to create a triable issue of fact as to whether her anxiety causes

"substantial limitations" in any major life activities, *Baker*, 546 F. Supp. 2d at 98.

Fitzgerald has not established that she is "disabled" within the meaning of the ADA, and

cannot, therefore, seek redress under its provisions.  Accordingly, Defendants' motion for

summary judgment on Fitzgerald's claims of disability-related discrimination, retaliation, and hostile work environment under the ADA is GRANTED.

IV.   <u>FMLA</u>

Under the FMLA, eligible employees are entitled to twelve weeks per year of unpaid leave because of a "serious health condition that makes the employee unable to perform the functions of the position of such employee." *Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 174 (2d Cir. 2006); *see also* 29 U.S.C. § 2612(a)(1)(D). The Second Circuit recognizes separate claims of interference and retaliation under the FMLA. *See Woods v. START Treatment & Recovery Ctrs., Inc.*, 864 F.3d 158, 166 (2d Cir. 2017). "[A]n employee brings an 'interference' claim when her employer has prevented or otherwise impeded the employee's ability to exercise rights under the FMLA." *Id.* And, an employee may bring a retaliation claim based on "actually exercising her rights or opposing perceived unlawful conduct under the FMLA and then being subjected to some adverse employment action by the employer." *Id.* Fitzgerald asserts both claims here. Am. Compl. ¶¶ 295–303.

A.   FMLA Interference

Fitzgerald claims that she was "eligible for, and on a regimen of, intermittent medical leave" under the FMLA by "taking time off work weekly to attend her psychotherapy appointments." *Id.* ¶ 256. She alleges that WeWork interfered with her FMLA rights by "unlawfully terminating her employment." *Id.* ¶ 302. She also alleges that "[d]uring [her] employment at WeWork, [she] needed to miss, postpone and cancel multiple therapy appointments." Fitzgerald Supp. Decl. ¶ 26, ECF No. 54.

An employer violates the FMLA's interference clause where it has "denied or otherwise interfered with a benefit to which [an eligible employee] was entitled under the FMLA."

*Graziadio v. Culinary Inst. of Am.*, 817 F.3d 415, 424 (2d Cir. 2016).  To establish a *prima facie* case of FMLA interference, a plaintiff must demonstrate: "(1) that she is an eligible employee under the FMLA; (2) that defendants constitute an employer under the FMLA; (3) that she was entitled to leave under the FMLA; (4) that she gave notice to defendants of her intention to take leave; and (5) that defendants denied her benefits to which she was entitled by the FMLA." *Roberts v. Ground Handling, Inc.*, 499 F. Supp. 2d 340, 351 (S.D.N.Y.2007) (quotation marks and citations omitted).  Defendants argue that Fitzgerald has failed to establish this *prima facie* case.  Defs. Mem. at 32–33.  The Court agrees.

Fitzgerald did not qualify as an "eligible employee" for FMLA purposes until March 25, 2020, twelve months after her start date.[7]  *See* Defs. 56.1 ¶ 2.  And, once Fitzgerald was entitled to FMLA leave, she "was obligated to provide [WeWork] with . . . at least thirty days' notice for leave that is foreseeable."  *Bowman v. CSX Transp., Inc.*, 22 F. Supp. 3d 181, 189 (N.D.N.Y. May 22, 2014).  As Fitzgerald continued attending a standing therapy appointment—as she had done since June 2019—her need for leave was clearly foreseeable.  Fitzgerald Tr. at 231.  But, the record does not establish that Fitzgerald "provide[d] enough information to put [WeWork] on notice that [she] may be in need of FMLA leave."  *Bowman*, 22 F. Supp. 3d at 189 (citing *Kobus v. Coll. of St. Scholastica, Inc.*, 608 F.3d 1034, 1036–37 (8th Cir. 2010)).

There is no evidence that Fitzgerald actually requested time off, or took "leave"—such as vacation or sick time—to attend therapy appointments.  She merely informed supervisors that

---

[7] "To be eligible for FMLA leave, an employee must have been employed for at least twelve months by the employer from whom she is requesting leave," and work for at least 1,250 hours in that twelve-month period. *Arroyo-Horne v. City of New York*, 831 F. App'x 536, 539 (2d Cir. 2020).  There is "no claim under the FMLA, however, when an employee is ineligible at both the time the employee provides notice of her intent to take leave, and the time the leave is to be taken."  *Condon v. Dormitory Auth. of New York*, No. 17 Civ. 1381, 2019 WL 1259569, at *4 (N.D.N.Y. Mar. 19, 2019).  To the extent Fitzgerald's FMLA interference claim is predicated on requests for leave prior to March 25, 2020, accordingly, "whether granted or denied, [they] are not actionable because they occurred before the 12-month mark."  *Daniel v. T&M Protection Resources LLC*, 87 F. Supp. 3d 621, 648 (S.D.N.Y. 2015), *vacated and remanded on other grounds*, 689 F. App'x 1 (2017).

she would be unavailable during "blocks" on her calendar for therapy, and would resume working thereafter.  Fitzgerald Tr. at 111–14.  This assertion merely shows that Fitzgerald availed herself of an accommodation—"flexibility with respect to in-office time"—to attend appointments during the workday, and not that she requested "any form of leave," such as a reduced schedule, to do so.  *See Macropoulos v. Metropolitan Life Ins. Co.*, No. 15 Civ. 6096, 2018 WL 1508564, at *13 (S.D.N.Y. Mar. 26, 2018) ("Although FMLA regulations do not require an employee to mention the FMLA specifically, they do require an employee to request leave, not just an accommodation.").  And, although "an employee's statements may give rise to a duty on the part of the employer to inquire into the nature of the employee's need for leave, the employer is not required to be clairvoyant." *Slaughter v. Am. Bldg. Maintenance Co. of New York*, 64 F. Supp. 2d 319, 326 (S.D.N.Y. 1999) (quotation marks and citation omitted).  There is no basis to find that Fitzgerald's desire to "maintain her [workday] flexibility put [WeWork] on notice that she desired FMLA leave" after she became eligible for it.  *Macropoulos*, 2018 WL 1508564, at *13.

Moreover, FMLA "interference" claims are an *ex ante* remedy to be used where an employer "has prevented or otherwise impeded the employee's ability to exercise rights under the FMLA." *Greenberg v. State Univ. Hosp.–Downstate Med. Ctr.*, 838 F. App'x 603, 605 (2d Cir. 2020) (citing *Woods*, 864 F.3d at 166).  There is no evidence suggesting that Fitzgerald's supervisors ever discouraged or prevented her from attending therapy, or otherwise impeded her ability to exercise FMLA rights.  *See* Fitzgerald Tr. at 111–14.  Indeed, Fitzgerald attended all her scheduled therapy appointments after March 25, 2020.  *See* Defs. 56.1 ¶ 165.  At best, Fitzgerald states that she was occasionally asked to reschedule appointments, Fitzgerald Tr. at 106–07—which does not establish a FMLA interference claim, *see Anderson v. New Orleans*

*Jazz & Heritage Festival & Found., Inc.*, 464 F. Supp. 2d 562, 568 (E.D. La. 2006).[8]

Accordingly, Defendants' motion for summary judgment on Fitzgerald's FMLA interference

claim is GRANTED.

      B.   FMLA Retaliation

      The FMLA "protects an employee from discharge or demotion . . . if that action is

motivated by the employee's taking leave pursuant to the FMLA." *Hale v. Mann*, 219 F.3d 61,

68 (2d Cir. 2000).  Fitzgerald argues that WeWork terminated her "shortly after she began

requesting time off to attend therapy appointments."  Pl. Opp'n at 27.  Retaliation claims brought

pursuant to the FMLA are subject to the *McDonnell Douglas* burden-shifting test.  *Alexander v.

Bd. of Educ. of City of New York*, 648 F. App'x 118, 121 (2d Cir. 2016).  A plaintiff must first

establish a *prima facie* case of retaliation by showing "(1) [s]he exercised rights protected under

the FMLA; (2) [s]he was qualified for h[er] position; (3) [s]he suffered an adverse employment

action; and (4) the adverse employment action occurred under circumstances giving rise to an

inference of retaliatory intent." *Potenza v. City of New York*, 365 F.3d 165, 168 (2d Cir. 2004).

Such an inference may be established through either direct evidence of retaliatory animus, or

circumstantial evidence, such as showing that "the protected activity was followed closely by

discriminatory treatment," or "disparate treatment of fellow employees who engaged in similar

conduct." *Smith v. North Shore-Long Island Jewish Health Sys.*, 286 F. Supp. 3d 501, 514

(E.D.N.Y. 2018) (citing *Littlejohn v. City of New York*, 795 F.3d 297, 307, 319 (2d Cir. 2015)).

A defendant may rebut this *prima facie* case with  a "legitimate, non-discriminatory reason for its

---

[8] The Court also notes that in *Greenberg*, the Second Circuit cast doubt on whether a FMLA interference claim can even be raised based on "allegations concerning [an] *ex post* adverse employment action[]," such as termination of employment, because such claims are "appropriately aimed at allegations concerning [an] *ex ante* denial of [a] request for FMLA leave."  838 F. App'x at 606.

actions." *Graziadio*, 817 F.3d at 429.  The plaintiff must then show that the defendant's proffered explanation is pretextual.  *Id.*

As discussed, the record does not establish that Fitzgerald "exercised rights protected under FMLA," because her testimony does not support that she requested "leave"—rather than merely flexible working hours—to attend her therapy appointments.  *See supra* at 20–21. Fitzgerald similarly has not established an inference of retaliatory intent motivating her inclusion in the RIF—she points to "no document or testimony suggesting that . . . any [WeWork] decision-maker considered her alleged need for FMLA leave as a negative factor in [their] decision to terminate [her]."[9]  *Lievre v. JRM Construction Mgmt.*, *LLC*, No. 17 Civ. 4439, 2019 WL 4572777, at \*19 (S.D.N.Y. Sept. 19, 2019).  Indeed, Fitzgerald "has not pointed to a single instance" where she was forced to miss or cancel a therapy appointment, or even that anyone at WeWork "tried to make it difficult for her" to attend her appointments, which casts doubt on her assertion that she was terminated for doing so.  *Coleman v. Prudential Relocation*, 975 F. Supp. 234, 246 (W.D.N.Y. 1997).

Finally Defendants have provided a legitimate, non-discriminatory reason for Fitzgerald's termination—a RIF that eliminated all US-based employees in her role.  Defs. Mem. at 36; *see also Lulo*, 2022 WL 409224, at \*6.  Fitzgerald argues that "Defendants' incoherent explanation for terminating [her] employment [was] wholly pretextual," but as explained, her subjective disagreement with Kondili and Agarwal's assessment of her skills and expertise—even if that assessment was wrong—does not, without more, establish pretext.  *Kwan*, 737 F.3d at 852

---

[9] Fitzgerald alleges that, during the RIF, Agarwal and Kondili explicitly considered a male employee's upcoming paternity leave in recommending him for inclusion in the RIF.  Pl. Opp'n at 27.  Defendants dispute this characterization.  *See* Kondili Tr. at 110–11.  But, although treatment of another employee in similar circumstances may provide circumstantial evidence of an employer's retaliatory intent, *Lulo v. OTG Mgmt., LLC*, No. 19 Civ. 3776, 2022 WL 409224, at \*6 (S.D.N.Y. Feb. 10, 2022), because the Court finds that Fitzgerald has failed to establish the *prima facie* requirement that *she* exercised rights protected under FMLA, this allegation, even if true, is insufficient to create a triable issue of fact that would defeat summary judgment.

(Parker, J., concurring in part).  Fitzgerald has failed, accordingly, to establish a *prima facie* case

of FMLA retaliation, and therefore, Defendants' motion for summary judgment on this claim is

GRANTED.

V.      NYSHRL and NYCHRL Claims

A district court has discretion to "decline to exercise supplemental jurisdiction" where, as

here, "it has dismissed all claims over which it has original jurisdiction."  28 U.S.C.

§ 1367(c)(3).  Where all federal-law claims are eliminated before trial, "the balance of factors to

be considered under the pendent jurisdiction doctrine . . . point toward [a federal court] declining

to exercise jurisdiction over the remaining state [and city] law claims."  *Carnegie-Mellon Univ.*

*v. Cohill*, 484 U.S. 343, 350 n.7 (1988)*; see also Cohen v. Postal Holdings, LLC*, 873 F.3d 394,

405 (2d Cir. 2017).  The Court has eliminated all of Fitzgerald's federal law claims.  And, the

NYSHRL and NYCHRL employ a different, more liberal substantive standard in resolving both

gender- and disability-based discrimination, retaliation, and hostile work environment claims.

*See, e.g.*, *Glaser v. Gap Inc.*, 994 F. Supp. 2d 569, 572–73 (S.D.N.Y. 2014); *Mihalik v. Credit*

*Agricole Cheuvreux North Am., Inc.*, 715 F.3d 102, 109 (2d Cir. 2013).[10]  Accordingly, the Court

declines to exercise supplemental jurisdiction over Fitzgerald's remaining NYSHRL and

NYCHRL claims.

---

[10] Although previously the "substantive standards for liability under the NYSHRL and Title VII" were considered to be "coextensive," *see, e.g.*, *Vuona*, 919 F. Supp. 2d at 393, recent amendments to the NYSHRL now provide that its provisions "should be construed liberally, 'regardless of whether federal civil rights law, including those laws with provisions worded comparably to the provisions of this article, have been so construed.'"  *Deveaux v. Sketchers USA, Inc.*, No. 19 Civ. 9734, 2020 WL 1812741, at *3 n.3 (S.D.N.Y. Apr. 9, 2020) (quoting NY Legis. 160 (2019), 2019 Sess. Law News of N.Y. Ch. 160 (A. 8421)).  These amendments "effectively rendered the [NYSHRL] standard . . . closer to that of the [NYCHRL]."  *Livingston v. Roosevelt Union Free Sch. Dist.*, No. 17 Civ. 4189, 2020 WL 1172642, at *11 (E.D.N.Y. Jan. 15, 2020), *report and recommendation adopted*, 2020 WL 1166450 (E.D.N.Y. Mar. 11, 2020).  The amendments do not apply retroactively, however.  *Id.*  As Fitzgerald's claims accrue after 2019, her NYSHRL claims are analogous to the substantive standards of the NYCHRL, rather than Title VII.

**CONCLUSION**

For the reasons stated above, Defendants' motion for summary judgment is GRANTED as to Fitzgerald's Title VII, ADA, and FMLA claims, and those claims are DISMISSED with prejudice.  The Court declines to exercise supplemental jurisdiction over Fitzgerald's NYSHRL and NYCHRL claims, and accordingly, those claims are DISMISSED without prejudice to renewal.  The Clerk of Court is directed to terminate all pending motions and close the case.

SO ORDERED.

Dated: March 30, 2022
      New York, New York

                          ANALISA TORRES
                   United States District Judge